Case number 09-3307, David Dazbach v. American Commercial Lines, LLC Your Honor, before we begin, how much time would you... It's 15 minutes for each side, and you can reserve any portion of that that you'd like, but we don't really stick... we don't hold you to those 15 minutes, certainly if there are questions, but we ask that you not spend a lot of time repeating the facts, because we are familiar with the briefs. Then, Your Honor, I'll take... I'd like to reserve five minutes for any rebuttal. Thank you. Good morning, Your Honors. My name is Dennis Minichiello, and along with Matthew Cook, my associate, we are here representing the appellant, American Commercial Lines. This is a case commonly referred to as a 905B action, as it was brought under the section of the Longshoremen's and Harbor Workers' Compensation Act, which is a federal statute. It's commonly referred to that, but it's not such a common cause of action in the state courts. At least, I've never run across one. That's correct, Your Honor. This Court has previously issued decisions in cases involving 905B, specifically two cases, the Wright v. Adonis Campanilla-Navarro, and excuse my Spanish pronunciation, Your Honor, case of 1978, and the Carrillo v. Indiana Grain Division case of 1986. Now, in those cases, the Court recognized that because it's not a common action in the state court, that it was required to apply federal decisional law with regard to the application of the 905B section. Those decisions made it clear that Mr. Dostbach had the burden to prove negligence on the part of appellant, American Commercial Lines, by establishing all of the following elements. First, the alleged defect in the toggle lock was unreasonably dangerous and existed before American Commercial Lines turned over the barge to Wholesome for unloading, and that that defect did not develop afterwards. And I emphasize the words both unreasonably dangerous and the word and. Secondly, ACL had actual or constructive knowledge that the toggle lock was defective prior to plaintiff's injury. Third, that the defect in the toggle lock was not obvious or anticipated by Mr. Dostbach. And fourth, that there was some negligent conduct by American Commercial Lines that approximately caused his injuries. Now, we addressed all of these issues in our briefs, and I don't want to repeat that, but we believe that the evidence demonstrated that Mr. Dostbach did not meet his burden of proof under 905B and that the trial court should have granted our judgment notwithstanding the verdict. All right. Let me stop you right there, counsel, because one of the problems I have with this case is that you're contending that the evidence overwhelmingly favors your side, that, in fact, the verdict contrary to your side cannot stand. And yet, as best I can tell, there was no pretrial motion to that effect in the lower court. And it seems to me that one inference that can be drawn by the absence of such a motion is that there are triable issues. If there are triable issues, then it becomes a question for the jury to resolve and not a question for a court of law to resolve. Well, whether we chose to file that motion or not shouldn't detract from the fact that the plaintiff still had the burden at trial. Reasons for going to trial can vary. And simply not filing a motion is not indicative of the lack of evidence. There's no question that one doesn't necessarily lead to the other, but I'm saying that we start at the position where it seems to me that the parties are at least going forward on the assumption that it's a triable case. And if it's a triable case, that means that there are questions of fact that need to be resolved, and questions of fact are only resolved by the trier of fact, and that's the jury. Well, Your Honor, the jury still is required in that scenario to consider the evidence. And it cannot engage in speculation or conjecture, which is what we believe happened here, because notwithstanding the fact that we did go through trial, the plaintiff put on no evidence, according to what we believe in any event, that there was in fact – has a contrary position to that. I'm sure he does, Your Honor. The Wright and Carrillo cases are particularly instructive here in how to apply those elements, the proof elements required by the plaintiff, and they support the argument that ACL should not be liable for Mr. Dasbach's injuries. In fact, application of those cases to the NC case should be sufficient to support a reversal of the trial court. In Wright, the handling of the discharge of the cargo from the vessel had passed to Wright's employer, who then, as the court recognized, was solely responsible for supervising Mr. Wright, and the vessel no longer owed a duty to Mr. Wright. And the key words here in that decision are, even if the vessel personnel had actual or constructive knowledge of the condition of the vessel at the time that it was turned over to Mr. Wright's employer. Now, similarly, in this incident case, Folsom, Dasbach's employer, had taken exclusive possession of the barge two days before Mr. Dasbach was engaged in – Let me just ask you regarding that proposition that you've just given us. It seems awfully strict that a person who has – let's take the hypothetical that the ship owner has constructive knowledge. But once control has passed over to the injured employee's employer, that constructive knowledge can't be relied upon to find liability on the part of the ship owner. That seems awfully strict, and you believe that's the holding in that case? That's the holding in that case. It's the holding in all federal decisions that we're aware of. It is almost a bedrock principle because the notion of 905B, as a result of the amendments that took place, is that the vessel owner was no longer going to be faced with the possibility of still being found negligent for conditions on the vessel once they turned it over to the stevedore. Here's the problem I have with that. It suggests that the person taking possession of the vessel must then do what's – inspect the vessel to make sure that there are no dangerous – unreasonably dangerous situations present on the vessel, and that seems like a very inefficient sort of thing to require the person to do. If they take possession of the vessel, I would think that they would expect the vessel to be in a reasonably safe condition. Well, I don't agree that it's not a difficult thing for an experienced and competent stevedore to do. That is the whole point of 905B, is to place the responsibility on the party that is going to be in charge of the work that's actually going to be done. They're the ones who are best equipped. Let's get to the facts of this case because here we have the latch, or I forget what it's called. Toggle lock. Toggle lock that he could not unlock. That's correct. So what do you believe should have transpired to have reduced the risk to the employer or reduced what eventually happened to the employee? Well, as far as reducing the risk, let's first back up just one step because, again, there's no evidence here that at the time that we turned the barge over to Holsom, the plaintiff's employer, that the toggle locks were, in fact, in defective condition. But would you – how would you address the question that a reasonable inference could be drawn that the toggle lock was in a defective condition? I would – Can I interrupt? I think because there – from my reading of it, there are some facts that the barge was – not the barge, but the ship was inspected. I think it was like maybe May 10th, and they looked at three covers, but they didn't look at the fourth and the fifth cover. There was some work on three of the covers, and don't you think there is an inference that could be drawn from that, that there may have been something wrong with those other two covers that weren't checked? No, I can't believe that that's a fair inference whatsoever because for a number of reasons. First of all, as we laid out in our brief and the evidence we presented at trial, the inspections that are conducted of these barges are done basically with a carte blanche authority to the companies that inspect them. So they can do the inspections, and whatever problems they find, they're permitted to fix and send us the bill, which if you can imagine that you have carte blanche to bill somebody for doing repair work, you're going to find as much repair work as you possibly can. So that's the general procedure. Right, exactly. But the people who were doing the inspecting of the dock or the – what is it, a ship? It's a barge. A barge. Yes. During the inspection, wasn't there evidence that they didn't do a good job in the inspection because they left 25-something, 25, what, thousand pounds or – I don't remember the number, but a lot of corn or something. There was a very – not 25,000 pounds. It was a very small quantity, about a bucket or two as I recall, of corn particles left in a forward hold in a small position. But that doesn't mean that an inspection of all of the equipment that's on the top of the barge wasn't done. And also, if you – you have to recognize that then when the barge is loaded, the toggle locks are opened and closed because you have to move the hatch covers in order to load the barge. Also, when the barge gets to Holsom, they opened, prior to Mr. Dasbach's involvement, some of the hatch covers, which would have necessitated the opening of the toggle locks. So it would not be a fair inference to draw from the fact that some repairs were done in May, that by the – in the beginning of May, that by the end of June, June 26, that somehow or other this – a problem with the toggle locks had been, you know, totally ignored or not noticed because there had been – there were no complaints certainly in between that period of time. Well, let's go – let's take a step back and at least agree upon that toggle lock on that fifth cover being unable to be opened without the steps. And maybe he took the wrong steps, but without the steps that the stevedore took. I mean, that – you'll concede that, right? Well, yes. The evidence shows that, in fact, when Mr. Dasbach first tried to open this – the toggle lock that proved to be this problem, he couldn't do it by hand. So doesn't the question just become, was that a defective condition or some other unexplained condition? And if it was a defective condition, which the jury could find, that's a factual question that is entitled to deference. No, because it has to be, first of all, an unreasonably defective condition. And secondly, it has to be an unreasonably defective condition that was caused by ACL prior to the time it was turned over to Dasbach and one that could not have been anticipated or was not open and obvious to Mr. Dasbach. And on all of those points, he fails. Remember the sequence of events with regard to the opening of the toggle locks. He first tries to open it by hand and can't. It's a small pry bar, then it gets a big pry bar. We know that. Okay, well, everybody's testified in this case, including Mr. Dasbach and his co-worker, that it was not uncommon to have to use a pry bar. So that means that it was not unreasonably defective, because if all you need to do is use a pry bar, and they had previously had that experience. Yeah, I think I took a leap there, because I think it's not unreasonably poor condition if he's able to open it with a small pry bar or even with a bigger pry bar without injuring himself in the process. That's where I was going. So he tries the pry bar in the first instance, and he can't do it. Now, assuming that was outside of his experience, then he had a couple of options, which were explained by Mr. Lynch, his supervisor. And the options were very simple, and ones that they had used prior to this time. They could have utilized the crane to open the lock. Not preferred, but they could have done that. They could have used a different kind of pulley and winch system to open it up. They chose not to do that. Both of those observations, I think, cannot be contested, but they seem to go to contributory negligence, which the jury recognized and faulted him substantially. But it doesn't go to whether or not the toggle locks were in an unreasonable condition to begin with. Well, with regard to contributory negligence, Your Honor, that has to be applied in the context of 905B. Now, ACL is not required under 905B to anticipate that Dostok would not act as a reasonable, incompetent stevedore, which in this case, by continuing to try and force that toggle lock, is exactly what he was doing. He wasn't supposed to do that. His supervisor said he wasn't supposed to do that. Mr. Lynch made it very clear, you run into that kind of problem, call me and we'll work this out. Didn't do that. So we're not responsible for anticipating that Mr. Dostok is going to exceed the instructions of his supervisor and proceed in a way that could lead to his injury when he encounters a problem. Secondly, we're not required, we had a right to rely on Mr. Dostok that he would do his job correctly, and he could have acted differently, and neither in the Carrillo case or the Wright case did this court find that comparative fault excused the stevedore from, in those cases, from 100% liability. So I don't think that while comparative fault is a doctrine applicable in marine cases, it does have to be looked at in the context of 905B and the proof requirements of the plaintiff, and that's where the major problem in this case is, that we could not anticipate that Mr. Dostok was going to move forward to resolve this problem. And remember, the other issue here is that when was this defect created? There is no evidence to suggest that it had been created beforehand. Even if a repair was done, as Your Honor was suggesting, back in May, or that a repair was missed, there is no suggestion that the toggle lock was either defectively repaired or required repairs back in May. But what do we know? Because of evidence that we presented to the court, which was uncontested evidence by way of expert testimony and testimony on the part of ACL employees, is that the manner in which Holsom handled the covers of that barge on the prior day before, and even on that day, was improper. The correct way to open these hatch covers is basically to pull them directly back. So you've got a hatch cover like this. You put a hook here. If you want to open it this way, you pull it straight back. So the tension remains constant. It remains even on both sides. What they were doing is they were attaching a line to one corner of a cover, attaching that to the dock, and then they were pulling the barge back. So you're torquing the covers. Uncontested testimony by very experienced people that that is just the wrong way to do it. In fact, it was a way that was specifically stated in materials that ACL published not to do it this way. You don't do it this way. But there were safe ways to do it. So it could very well have been that the toggle lock was unreasonably tight, but you can't jump from that to the conclusion that it was unreasonably tight because it had a defect in it or because of the way it had been previously handled by ACL. The evidence just isn't there. And it's the plaintiff's burden to get over that, and he never submitted any evidence in that regard. So that's why we believe the jury in this case speculated, and they used the doctrine of comparative fault in a way that was not appropriate for this case. I see that my 15 minutes is up, Your Honor. I'll give you five minutes at the end. Fine. Thank you, Your Honor. Thank you. Thank you. May it please the Court, Andrew Allen for a Plaintiff's Appellee. First of all, I'd like to discuss a little bit the history of 905B. It was changed from the prior law. And it did say in the comments the liability of the shipowner will be guided by land-based principles of negligence. And the issue of negligence and liability was to be determined through accepted principles of tort law and litigation. When you mention the history, are you suggesting that Carrillo or Wright are outdated? Yes. For one thing, yes. You see a progression of cases, and they seem to make a distinction between problems with the ship and problems with the cargo, the way the cargo is stowed, the cargo stowed. And this makes sense. There's a good policy reason for this, because the shipowner is in control of the mechanics, such as the toggle locks, the covers on this barge. But they're not so much in control of the actual stow of the cargo, because that's done by the stevedores on one end, and then it's unloaded by the stevedores on the other end. And once the ship's underway, the shipowner has very little control over the actual cargo. So it seems to be that the courts have developed more or less the reasonable standard, all things considered. And there's lots of cases that say that you should take into consideration the actual practices, you know, in the trade, in the business. And in Hallett, there's only two Supreme Court cases that are cited here, and one is the Cyndia case, which set out the three duties, the turnover duty, which we're concerned with here, and the other two duties we're not really concerned with here. It's the duty to turn over the ship in such a condition that the stevedore or, you know, the plaintiff here could unload it safely. And they've developed several exceptions to the open and obvious rule here, and we're not conceding it is an open and obvious condition. First of all, we say it's not open and obvious because he knew that some of the locks were sometimes hard to open and needed a pry bar to open them up, but he didn't know it was under such great tension as it was. Have you ever broken a key off in a lock? You know, why didn't you stop just before it broke? Because you assume that, like, you know, most locks, you'd be able to turn the key in and it's not going to break off. Same thing if you ever twist a bolt off your wheel when you're trying to change a tire. It's the same thing. You know, you don't think it's going to twist off. You think it's going to unscrew like it's supposed to. And that's what happened here with David Dyspot. It was just an unreasonable amount of pressure. And the court over the history has seemed to have developed a practical measures exception, and that's that the shipowner should anticipate that the stevedore will go ahead and face the danger, even if it is open and obvious, that he will face it because to use other measures, which he could use, are impractical or time-consuming. And that's what we have here. David Dyspot testified that this happened, you know, during a time when, as you all know, the construction boom was in its heyday, and they're unloading cement. There's trucks sometime stacked 10 deep to be loaded, and that's what David was doing, was loading the trucks while his partner unloaded the barges. And he has to get back up there and finish loading the trucks. So he's trying to get the job done. How do we get to, you know, imputing knowledge on the part of the barge owner? Well, there's things that they – like we talked about the repairs. The repairs that were done at their facility at Vermont before the barge was loaded, their barge history indicates that there were repairs done at that time. That's repairing code. Defendants say, well, that was probably just a mistake. It wasn't really being repaired. But if you look at the – you go to the barge history. You look at the entry before that. That's ARP, which stands for awaiting repairs. And that's set out in the codes in defendant's supplemental record. So I doubt that that was a mistake. And where are those records? And we know from plaintiff's testimony that both of the locks on that cover have been modified. You can tell by the way they were burnt and bent, both of them. Yet they only produced one record of that. Now, in their supplemental – in their reply, they say, well, they were never asked to produce, you know, the records from before. But, in fact, they were. If you look at, you know, what we cited, the prior discovery, in our original discovery, we asked for all of the – you know, on every date when this was repaired, every date the repairs were – going clear back. Now, they have a duty to supplement that. I shouldn't have to keep going back in the court and say, well, what about it? Give me this. You know, they did produce things that were specifically asked for later. What about the evidence before the jury? Was the evidence such that the jury could, you know, not do – not go contrary to the evidence and actually find and enter the verdict it did? Sure. There was an event like the covers. As we cited, the covers being reset. Something happened either during loading the cargo or after it was away from the facility that caused those covers to be off the tracks. Now, whether it hit something or whether there was just something wrong with the tracks themselves, there's all testimony that these things could cause the covers to be hard to – the locks to be hard to open. So they could infer from that that something happened, yet no records were produced as of what happened. And that's, you know, an explanation of what – you know, where the inference is. And the defendant is relying upon everyone following their guidelines to the letter for inspections and everything, and it's obvious they don't because of the corn that was left for several loads. There was corn and then after that I believe pig iron and then soybeans. And if they have carte blanche authority to remedy all these things, why don't they just, you know, stick the pump in and pump the stuff out and all they've got to do is put the pump in and start the clock and they can make money doing that. So we think there was sufficient evidence of the condition of the locks. And they have a duty to warn. That's what we're saying here. They have a duty to warn that there was something that happened to this barge along the way. And in the repair records afterwards, you can see where some – I think some track was welded. Unfortunately, the person who was in charge of the facility where it went right after the accident, he had died. So we don't know exactly what that inspection showed, but there's been various interpretations of what his records showed by defendant's witnesses. And we think that there's a question as to how they – when they do adjust these, how they do them, because their expert, you know, William Carrier, he initially testified in his – he has a written report that said that if these locks are properly adjusted, you need a bar to open them. And then at trial, no, he changed it, changed his testimony. Same thing with their barge maintenance coordinator, Brad Dickerson. He said that originally that you need a bar to open them. And then at trial, well, no, just if you do need a bar, very little. So – and the jury had a chance to observe these witnesses, and they made their decision based on the facts and the evidence. And the thing to point out is that if the employer at Folsom was negligent at all for the type of method they used, the side pull to open the barge covers, even if they were, if they were 90 percent at fault, according to the case law, that's not to be considered here. Only the plaintiff can still recover the full amount of his damages against the shipowner if they're even 1 percent at fault. The only thing to take into consideration is the employee or the plaintiff's comparative negligence, which obviously the jury did. And the defendant points out or mentions the barge cover handling procedures, which shows – I don't know if the courts had a chance to look at those documents or the diagrams, how you thread all the ropes through the thing, but there was no evidence that this was ever actually given to the plaintiff's company. They had never seen anything like that. And if you note the report, the memo with it, this is because they're concerned about, you know, the wear and tear on their covers. If this can cause the locks to be hard to open, why don't they put that in the memo? Why don't they say this is another reason to do that? This is what can happen. And they know that these covers are open this way. This is a common thing. I believe William Carrier testified, their expert testified, that this is a common practice, and he couldn't say whether more or less than half of the companies up and down the river use this side-pull method. It's an efficient way to open the barge so they can get the product out. In the locks were not, you know, they may have been inspected for the time that the ship was loaded until the time it was unloaded, but during those several months, the counsel talked about the locks were never open. There's no evidence that they were ever opened. And as far as Plaintiff calling his employer to say, oh, I've got a stuck lock here, what do I do? This is two or three in the morning. Can you imagine a call to, you know, his employer at two or three in the morning, saying, I have this lock that's difficult to open? And he testified he'd never called his boss about that. They were expected to deal with it and get back up to load the trucks that are waiting in line. And we submit this was a question of fact, and the jury had the facts, and they made their determination. They had a chance to observe the demeanor of the witnesses, and now they testify. And there's further evidence of the way they maintain their barges. If you go through the barge history and the codes, that the repairs were made at Armat by their facility. We don't know what was done again. They didn't produce any records for that, although there should have been records. And then after that, that was on the 6th. On the 8th, that's when an outside vendor pumped the corn out of the tank and tried to make repairs, and the thing was leaking at that time. They go ahead and load it the next day at Globalplex. And then two days later, the same outside vendor pumped more water, because it's still leaking, and that's when they had to reset the cover. And the thing is still leaking at that time, and isn't that an important factor in maintaining a barge is that it doesn't leak? And whatever happened, it's also important to note that whatever happened to that barge from the time it was loaded until the time it was unloaded, it was the barge owner's responsibility. I'm sure you've all heard of the phrase, captain of the ship, and that's where it comes from. It's his responsibility no matter what happens. It's either to fix it or warn the people downstream or upstream that may be here that there may be something wrong with it, and you better be careful. And another document that was missing was the barge inspection report that was the defendant's own form. And this is where they would report anything that was wrong with the barge when it came in. There may well have been something that the employers noted when it came in. And they said there's testimony that they filled out one of those for every barge whether there's something wrong or not, and that's facts of the defendant. The defendant didn't come up with their copy. The employer couldn't find theirs. We have no control over that. We're just an employee. But the defendant never came up with theirs. Where's that record? All right, you can wrap up. So I think in summary there was plenty of evidence. And one more thing as far as the site. Well, there was testimony that after you get half the barge unloaded, which was the condition the barge was in here when the plant tried to open that lock, that the barge would sink. The rear end of the barge would sink because this is half full of cement and the front is empty. And if the covers were properly adjusted and working properly, they would tend to roll toward the rear of the ship, and that would certainly release any tension on the locks. In summary, we believe that there was ample evidence for the finer fact to find in favor of the plaintiff. All right, thank you. Thank you. With regard to the burden of proof and the applicable law, I'd like to go back to what the Supreme Court said with regard to the 1972 amendments to the Section 905B, where basically they said the purpose of those amendments was to foreclose vessel liability based on a theory of unseaworthiness or non-delegable duty, thereby eliminating vessel liability for injuries that could have been anticipated and prevented by a competent stevedore or longshoreman. That's the nub of 905B. And in this case, the evidence is overwhelming that, in fact, Mr. Dasbach just tried to force open a toggle lock, one that he had experienced was under pressure in a way that was inappropriate. We cannot be, we being American Commercial Lines, cannot be liable to anticipate that Mr. Dasbach is going to engage in that kind of conduct. But you understand our difficulty in you're asking us to, in effect, rule that, as a matter of law, the stevedore that was injured in this case did it on his own and then no liability extends to ACL. That's a hard thing to do. This Court has already done it twice, in Carrillo and Wright. In both of those cases, you had almost identical factual situations of stevedores engaging in conduct that, in the face of proven defects, and, of course, we have that question of doubt here, and fault was not assigned on a comparative basis to the vessel owner because the vessels in those cases were under the complete control of the stevedore at the time of the injuries. And that's exactly what we have here. So I don't, if you're going to try to distinguish that, that's fine. I know counsel has tried to distinguish that by saying that the case law can be read to say that what we're talking about there is issues with regard to the cargo and not with vessel equipment. Of course, that's not recognized at all in the case law. And, in fact, again, and I think it was the Carrillo case, that was a case of vessel equipment. So, again, there's no legal support for that proposition. HOLLIT doesn't stand for that proposition. We pointed out the reasons for that, and I won't belabor them, but they're in our brief as to why Supreme Court's decision, HOLLIT doesn't support the plaintiff's position in that regard. So there is no exception in that regard. We addressed the repair issues, the repair documents issued thoroughly and supported it with the testimony that occurred at trial. There were no missing repair records here, period. The fact that there may not be a repair record for a particular event doesn't mean that, one, inspection wasn't done. And, secondly, it certainly doesn't mean that there was a problem. In fact, it means probably just the opposite. If there's no repair record, an invoice showing that a provider did a repair to a barge, it means that none was found to repair. None was found to bill for back to ACL. So there's no billing for the inspection itself? What happens in these situations is when the evidence is laid out in the record, is that when these barges are loaded or unloaded, the facilities that do them are under instruction to report any problems and authorized to make repairs. When the barges are then cleaned in between cargoes, obviously you don't want to mix grain with cement, so they're cleaned. The cleaning facilities to which they're sent are under instruction to examine the barges and have that carte blanche that I mentioned earlier to repair the barges. But you're not going to have a repair record if one isn't done. And, no, if they don't find anything, nothing's going to be generated. But it is interesting, and I was interested to hear, that counsel was relying in part on the inspection record that was produced by Crest Hill Marine for the inspection of the barge after this cargo was unloaded. It went into Crest Hill for cleaning. And they had a little pre-printed form of things that they would check off that they inspected and repaired. And there's an item on there for toggle locks, and there's no check. So they inspected the barge. They did make other repairs, as counsel correctly pointed out. But toggle locks, which is something that they would inspect for on a regular basis as confirmed by the form, showed that no repairs were necessary. That was after the injury. So both before and afterwards, we have nothing. But that doesn't mean that repairs were necessary. It probably means, in fact, that repairs were not necessary. And then as far as getting back, Judge Lampkin, to your question about the leftover small quantity of grain, I'd like to point out and direct the Court's attention to the Cameron decision out of the Seventh Circuit Court of Appeals, remembering, again, we go back to federal decisional law as the primary source for the law in this case. In Cameron, the Seventh Circuit outlined the practice in the river barge industry and how the towing companies, like ACL, rely on various vendors in the process for keeping their barges well-maintained. And that's custom and practice. And that we're not, that ACL is not liable, somebody in our position would not be liable if one of those vendors misses something. So to the extent that there's any connection between a missed repair of a toggle lock or a toggle lock that was not correctly repaired, that would have been done by an outside vendor. And there were many instances of that between October 2000 and June of 2001 at the time of this incident. There were six other loads, and five of those would have required the opening and closing of hatch covers and inspections and opening and closing of toggle locks. And through all of that process, it's other people that are handling our equipment. And there's no mention made of a problem with the toggle lock that required the kind of repair that counsel is suggesting may have taken place that was not recorded. So when you come right down to it again, that's what the evidence tells us. So in conclusion, and recognizing the deference that this court does pay to jury verdicts, we believe the jury simply got this wrong, that they took inferences from the evidence that simply were impermissible, relied on speculation to come up with their verdict. And the trial court, therefore, ruled incorrectly on our motion for judgment notwithstanding the verdict, and we respectfully request that that be reversed. All right. Thank you very much. We thank both counsel, and the case will be taken under advisement.